UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
DALLAS PESOLA,

                       Plaintiff,                           15-cv-1917 (PKC)(SN)

           -against-                              MEMORANDUM
                                                       AND ORDER

THE CITY OF NEW YORK, NYPD DEPUTY
INSPECTOR EDWARD WINSKI, NYPD
LIEUTENANT FRANK VIVIANO, Patrol Boro
Manhattan South Task Force, and NYPD
OFFICER DOES 1-7,

                      Defendants.
---------------------------------------------------------x
---------------------------------------------------------x
BENJAMIN ALLEN,

                       Plaintiff,                           15-cv-1918 (PKC)(SN)

           -against-

THE CITY OF NEW YORK, NYPD DEPUTY
INSPECTOR EDWARD WINSKI, NYPD
SERGEANT BRIAN BYRNES, NYPD
OFFICER JOHN BAIERA, Shield 15656 of
Patrol Boro Manhattan South Task Force, and
NYPD OFFICER DOES 1-8,

                      Defendants.
---------------------------------------------------------x


CASTEL, U.S.D.J.

          The above-captioned actions brought by two individuals, Dallas Pesola and

Benjamin Allen, arise out of their arrests by officers of the New York City Police Department

("NYPD") in Zuccotti Park on March 17, 2012.  The defendants in both actions move to dismiss the substantially similar complaints.

Briefly, plaintiff Pesola brings his action against Deputy Inspector Edward Winski and Lieutenant Frank Viviano, who are employed by the NYPD, 7 unnamed individual NYPD Officers (Pesola's Does #1-7), and the City of New York (the "City").  Plaintiff Allen brings his action also against Deputy Inspector Edward Winski and the City, as well as Sergeant Brian Byrnes and Officer John Baiera (Shield #15656), and 8 unnamed individual NYPD Officers (Allen's Does #1-8).  Both plaintiffs claim that, while observing people engaged in a protest in Zuccotti Park, they were arrested and, then and thereafter, denied certain constitutionally-protected rights.  They maintain that they were falsely arrested, subjected to excessive force, excessive detention, and malicious prosecution, prevented from exercising their First Amendment rights, and deprived of due process of law.  Pesola also claims he was deprived of his right to a fair trial.

For reasons that will be explained, the motion to dismiss the Pesola action is denied as to Pesola's excessive detention claim, excessive force claim, and a failure to intervene claim related the use of excessive force, but is otherwise granted.  The motion in the Allen action is denied as to Allen's excessive detention claim, but is otherwise granted.

THE FACTS ALLEGED

For the purposes of defendants' motion, all non-conclusory factual allegations set forth in each plaintiff's complaint are accepted as true, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and all reasonable inferences are drawn in favor of each plaintiff as the non-movant, see In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

On the afternoon of March 17, 2012, both Dallas Pesola and Benjamin Allen were present on the sidewalk near 1 Liberty Plaza, also known as Zuccotti Park.  (Pesola's Complaint ("P. Compl.") ¶ 15; Allen's Complaint ("A. Compl.") ¶ 15).  Pesola was there "observing people engaged in expressive protest activity."  (P. Compl. ¶ 17).  And, Allen was present observing and photographing the same.  (A. Compl. ¶ 17).  Beside the people protesting, there were a large number of police officers present and an even larger number of individuals who, like Pesola and Allen, were observing, photographing, or video-recording the demonstrators and police.  (P. Compl. ¶¶ 21-22; A. Compl. ¶¶ 21-22).

Around 2:00 p.m., Deputy Inspector Winski gave orders for observers who were not on the sidewalk to get on the sidewalk.  (P. Compl. ¶¶25-26; A. Compl. ¶¶ 25-26).  The police officers themselves then "flooded" the sidewalk, (P. Compl. ¶ 27; A. Compl. ¶ 27), and began walking in a southerly direction.  (P. Compl. ¶ 28; A. Compl. ¶ 28).  Both Pesola and Allen allege that this action by the police "hem[ed] in demonstrators and add[ed] to the congestion."  (P. Compl. ¶ 28; A. Compl. ¶ 28).  The police then gave a dispersal order to clear the sidewalk.  (P. Compl. ¶ 30; A. Compl. ¶ 30).  Some demonstrators did not obey the dispersal order.  (P. Compl. ¶ 31; A. Compl. ¶ 31).

After giving the dispersal order, Winski and several other police officers (including Pesola's Does #3-6 and Allen's Does #3-8) began arresting demonstrators and observers, allegedly using excessive force.  (P. Compl. ¶ 32; A. Compl. ¶ 32).  This, according to both Pesola and Allen, caused even further congestion on the sidewalks.  (P. Compl. ¶ 32; A. Compl. ¶ 32).  Pesola's Does #3-7 and Allen's Does #3-8 then proceeded to "riot[] on the sidewalk," while Winski and others remained present at the scene.  (P. Compl. ¶¶ 33-34; A. Compl. ¶¶ 33-34).

1.   Pesola's Arrest and Detention.

Pesola did not disperse in response to the order, but remained on the scene and moved in closer to the crowd to observe police officers arresting one of the demonstrators.  (P. Compl. ¶¶ 35-36).  At that point, around 2:25 p.m., Winski approached Pesola and arrested him, allegedly using excessive force, including a "choke hold."  (P. Compl. ¶¶ 35-37).  Pesola's Does #3-6 assisted Winski in the arrest and also used "excessive force" on Pesola, including "twisting Plaintiffs [sic] arm behind his back and raising it to his shoulder blades."  (P. Compl. ¶ 38).[1]

Pesola alleges that, after arresting him, Winski and Viviano "falsely reported that Plaintiff had engaged in criminal conduct," causing Pesola to be held in custody, arraigned, and then released.  (P. Compl. ¶ 41).  He also alleges that Winski and Viviano subsequently "filed falsified reports," causing Pesola to be criminally prosecuted on "false criminal charges."  (P. Compl. ¶¶ 42, 66).  According to Pesola, those charges were "maliciously initiated . . . in retaliation against [him] for his exercise of First Amendment rights [and] for his failure to obey NYPD officer orders with the level of respect and subservience Defendants felt he should show; and for his political views."  (P. Compl. ¶ 67).  The criminal charges against Pesola were eventually dismissed.  (P. Compl. ¶ 43).

After being arrested, Pesola was detained for 38 hours before being arraigned.  (P. Compl. ¶¶ 44, 47).  Around the 23rd hour of detention, according to Pesola, "all necessary steps had been taken to prepare [him] for arraignment."  (P. Compl. ¶ 44).  But, he was not arraigned.

---

[1] Pesola attaches 13 photographs to his Complaint as exhibits, which, according to him, show the events described in his complaint.  (P. Compl. Ex. A 1-13).  On a motion to dismiss, it is appropriate for the Court to consider any documents, including photographs, attached as exhibits to a plaintiff's complaint.  Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) ("When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' amended complaint, which are accepted as true, *to documents attached to the complaint as an exhibit or incorporated in it by reference,* to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.") (emphasis added).

Instead, Pesola's Doe #7 allegedly ordered Pesola to submit to an infra-red scan of his iris and told Pesola that if he refused to submit he would not be arraigned.  (P. Compl. ¶ 45).  Pesola refused the scan, (P. Compl. ¶ 46), and he was not arraigned for another 15 hours, (P. Compl. ¶ 47).

 2.   Allen's Arrest and Detention.

Allen also did not disperse in response to the order, but remained with the crowd and moved in closer to observe and photograph police officers arresting one of the demonstrators.  (A. Compl. ¶¶ 35-36).  Winski ordered Allen to back-up, but did not direct him to leave or go to any other specific area.  (A. Compl. ¶¶ 37-39).  Allen backed up a few feet while continuing to photograph the arrest.  (A. Compl. ¶ 40).  At that point, Winski proceeded to grab Allen by his jacket and "guide[] him forward along the sidewalk."  (A. Compl. ¶ 41).  Allen moved in the direction Winski was guiding him until 5 other officers (Allen's Does #3-8) grabbed Allen and pulled him "forcibly and violently in opposing directions."  (A. Compl. ¶¶ 43-44).  Allen's Does #3-6 then "proceeded violently to attack [Allen] and drive his face into the pavement while twisting his arms behind his back."  (A. Compl. ¶ 45).  Those same officers, in the presence and under the approval of Winski, arrested Allen.  (A. Compl. ¶¶ 46-47).  Sergeant Byrnes and Officer Baiera were also present during the seizure and arrest of Allen.  (A. Compl. ¶ 49).[2]

Allen also alleges that Winski, Byrnes, and Baiera "falsely reported that [Allen] had engaged in criminal conduct," causing Allen to be held in custody, arraigned, and then released.  (A. Compl. ¶ 52).  The criminal charges against Allen were eventually dismissed as well.  (A. Compl. ¶ 43).

---

[2] Allen also attaches 14 photographs to his Complaint.  (A. Compl. Ex. A 1-14).  The Court will consider these photographs as well.  See Brass, 987 F.2d at 150.

After being arrested, Allen was detained for a total of 47 hours before being arraigned. (A. Compl. ¶¶ 60-61). Allen, like Pesola, alleges that "all necessary steps had been taken to prepare [him] for arraignment" around the 23rd hour of his detention and that he was even brought into the courtroom in anticipation of his arraignment. (A. Compl. ¶¶ 54-55). But, he, again like Pesola, was not arraigned. Instead, Allen's Doe #7 allegedly ordered Allen to submit to an iris scan and told Allen that if he refused to submit he would not be arraigned. (A. Compl. ¶ 56). Allen also refused the scan, (A. Compl. ¶ 57), and Allen's Doe #7 allegedly told him "[w]e'll try this again tomorrow," (A. Compl ¶ 58). Allen never submitted to the iris scan and he was not arraigned for another 24 hours. (A. Compl. ¶ 59).

Both Pesola and Allen allege that the iris scan was not authorized by statute, (P. Compl. ¶ 52; A. Compl. ¶ 65), but was instead "an official, written, NYPD policy" implemented in order to obtain infra-red scans of all detainees, (P. Compl. ¶ 54; A. Compl. ¶ 67).

Pesola and Allen also allege that the City maintains certain policies, through formal and informal orders and directives, including: (1) mandating "false arrests of persons engaged in," and suppressing, "First Amendment activity in the public spaces of New York City," by issuing orders that create congestion followed by issuing "unlawful" dispersal orders. (P. Compl. ¶¶ 1-2, 68-69; A. Compl. ¶¶ 1-2, 78-79); (2) permitting officers to "conceal their own identities and the identities of fellow officers directly participating in arrests and uses of force," (P. Compl. ¶ 70; A. Compl ¶ 80); (3) failing "to bring disciplinary charges against those officers who sanction or ignore [or cover up] unlawful stops, searches, arrests, imprisonments, use of excessive force, and interference with citizens' rights under the U.S. Constitution 1st and 4th Amendments," (P. Compl. ¶ 71; A. Compl. ¶ 81); and, (4) failing to properly train defendants, (P. Compl. ¶ 101; A. Compl. ¶ 101).

DISCUSSION

I.     Legal Standard.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action," are not entitled to any presumption of truth.  Id.

II.    Plaintiffs' Section 1983 Claims.

To state a claim under section 1983, a plaintiff must allege that state officials, acting under color of state law, deprived her of a right guaranteed to her by the Constitution or federal law.  42 U.S.C. § 1983; see Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  Here, both plaintiffs' claims are predicated on allegations that they were: (a) falsely arrested, (b) subjected to excessive force, (c) subjected to excessive detention, (d) deprived of their rights to due process under the Fourteenth Amendment, (e) victims of malicious prosecution, and (f) deprived of their rights under the First Amendment.  Pesola also alleges that he was deprived of his right to a fair trial.  Both plaintiffs allege that certain individual defendants failed to intervene to protect them from the deprivation of their rights, see Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994), and that the City of New York is liable for their alleged constitutional violations, see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 696 (1978).  The Court will examine each plaintiff's claims in turn.

A.  False Arrest.

Claims for false arrest brought under section 1983 "are 'substantially the same' as claims for false arrest . . . under state law." Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). "To state a claim for false arrest under New York law, plaintiffs must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (quoting Bernard, 25 F.3d at 102 (2d Cir. 1994)). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Id. at 852.

There is probable cause to arrest "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Id. And, it is not necessary for probable cause to have existed "with respect to each individual charge" so long as "probable cause existed to arrest for any crime." Marcavage v. City of New York, 689 F.3d 98, 109 (2d Cir. 2012). A court "must examine the totality of the circumstances of a given arrest" and judge those circumstances "from the perspective of a reasonable police officer in light of his training and experience." United States v. Delossantos, 536 F.3d 155, 159 (2d Cir. 2008).

Defendants argue that the undisputed facts alleged in the two complaints show that there was probable cause to arrest Pesola and Allen for disorderly conduct in violation of

N.Y. Penal Law §§ 240.20(5) and 240.20(6) and to arrest Allen for loitering in violation of N.Y. Penal Law § 240.35(4).[3]   Under § 240.20(5), "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e obstructs vehicular or pedestrian traffic."  Under § 240.20(6), "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse."  And, under § 240.35(4), "[a] person is guilty of loitering when he . . . [b]eing masked or in any manner disguised by unusual or unnatural attire or facial alteration, loiters, remains or congregates in a public place with other persons so masked or disguised, or knowingly permits or aids persons so masked or disguised to congregate in a public place."  Because the Court concludes that defendants had probable cause to arrest both Pesola and Allen for violations of N.Y. Penal Law § 240.20(6), it will not address whether probable cause existed to arrest either plaintiff for other violations.

        To show that there was probable cause to arrest for a violation of N.Y. Penal Law § 240.20(6), four elements must be established: "(1) defendant congregated with other persons in a public place; (2) was given a lawful order of the police to disperse; (3) refused to comply with that order; and (4) acted "with intent to cause public inconvenience, annoyance or alarm" or with recklessness to the "risk thereof."  United States v. Nelson, 10 cr 414 (PKC), 2011 WL 1327332, at *3 (S.D.N.Y. Mar. 31, 2011) aff'd, 500 Fed. App'x 90 (2d Cir. 2012); cf. Provost v. City of Newburgh, 262 F.3d 146, 157 (2d Cir. 2001).  The undisputed facts alleged in both complaints show that defendants had knowledge or reasonably trustworthy information of sufficient facts

---

[3] Disorderly conduct and loitering are violations, not crimes.  N.Y. Penal Law §§ 240.20, 240.35.

and circumstances to warrant arresting Pesola and Allen for disorderly conduct, pursuant to N.Y. Penal Law § 240.20(6).

First, both plaintiffs were congregating with other persons in a public place. According to the New York Court of Appeals, "[t]he term 'congregates with others', as used in the statute, requires at the very least three persons assembling at a given time and place." People v. Carcel, 3 N.Y.2d 327, 333 (1957). Pesola and Allen allege that, just before they were arrested, they were both on the sidewalk adjacent to Zuccotti Park watching "people" engage in protest— and, in the case of Allen, photographing protestors. (P. Compl. ¶¶ 17-18; A. Compl. ¶¶ 17-18). Both plaintiffs also allege that "the number of police present was well in excess of the number of those engaged in demonstrating, but not as great as the number who were observing." (P. Compl. ¶ 21; A. Compl. ¶ 21). In addition, several of the photographs included as Exhibit A in both complaints show that there was a large crowd assembling around the area where each plaintiff claims he was standing. (P. Compl. Ex. A; A. Compl. Ex. A). The combination of these allegations shows that Pesola and Allen were assembling on the sidewalk of Zuccotti Park with more than three other persons.

Second, defendants gave a lawful dispersal order. An order to disperse is lawful under § 240.20(6), "unless the order was 'purely arbitrary' and 'not calculated in any way to promote the public order.'" Crenshaw v. City of Mount Vernon, 372 Fed. App'x 202, 206 (2d Cir. 2010) (quoting People v. Galpern, 259 N.Y. 279, 284-85 (1932)). While both plaintiffs makes the same conclusory allegation that the dispersal order was "unlawful," the facts alleged in each complaint show otherwise. Pesola and Allen allege that the police gave an order for all observers not already on the sidewalk to get on to the sidewalk. (P. Compl. ¶ 26; A. Compl. ¶ 26). This created "congestion" on the sidewalk where each plaintiff was standing. (P. Compl. ¶

29; A. Compl. ¶ 29).  The photographs in both Exhibit As corroborate each plaintiff's allegations and show that the sidewalk around the protest became increasingly congested.  (P. Compl. Ex. A; A. Compl. Ex. A).  Soon thereafter, the police gave a dispersal order to clear the sidewalk.  (P. Compl. ¶ 30; A. Compl. ¶30).

Those allegations are sufficient to warrant a reasonable belief that the dispersal order to clear the congested sidewalk around the protest was not arbitrary, but instead was calculated *to promote* the public order.  See Marcavage, 689 F.3d at 104 (quoting Bery v. City of New York, 97 F.3d 689, 697 (2d Cir. 1996) ("Government 'certainly has a significant interest in keeping its public spaces safe and free of congestion.'"); see also Rivera v. City of New York, 40 A.D.3d 334, 338 (1st Dep't 2007) (finding that dispersal order given to individuals handing out fliers on crowded boardwalk was lawful).  Pesola's and Allen's allegations that the defendants themselves contributed to the congestion, (P. Compl. ¶ 24; A. Compl. ¶ 24), do not undermine the fact that there was substantial congestion and that defendants gave the dispersal order to alleviate that congestion.

Third, neither Pesola nor Allen complied with the lawful dispersal order.  Both plaintiffs allege that after defendants gave the dispersal order, "some demonstrators chose not to obey."  (P. Compl. ¶ 31; A. Compl. ¶ 31).  In response, the defendants "violently attack[ed]" and arrested observers and demonstrators.  (P. Compl. ¶ 32; A. Compl. ¶ 32).  This, according to Pesola and Allen, caused more observers and demonstrators to gather around instead of disperse in compliance with the order.  (P. Compl. ¶ 32; A. Compl. ¶ 32).  Both Pesola and Allen, along with other observers, remained and approached to observe and/or photograph the arrest of demonstrators.  (P. Compl. ¶¶ 35-36; A. Compl. ¶¶ 35-36).

Pesola alleges that defendants arrested him right after he approached an active arrest.  (P. Compl. ¶ 37).  And, Allen alleges that, after he leaned in to photograph an active arrest, Winski grabbed him and "guided him forward along the sidewalk."  (A. Compl. ¶¶ 40-41).  Five other officers (Allen's Does #3-7) then allegedly grabbed Allen and pulled him "forcibly and violently in opposing directions."  (A. Compl. ¶¶ 43-44).  At that point, Allen was arrested.  (A. Compl. ¶ 46).  Each plaintiff's allegations make plain that Pesola and Allen did not comply with the dispersal order.  Instead of leaving the scene, Pesola remained and got closer to the crowd in order to observe the conduct of police officers and Allen remained and approached the officers to photograph an active arrest.  The photographs attached to each complaint corroborate these conclusions.  (P. Compl. Ex. A; A. Compl. Ex. A).

Fourth, the allegations in each complaint support a reasonable belief on the part of the arresting officers that each plaintiff acted recklessly in creating a risk of causing public inconvenience, annoyance, or alarm.  This last element contains two separate but related requirements: a public conduct requirement and an intent requirement.  See Provost, 262 F.3d at 157-58.  Regarding the public conduct requirement, the Court must assess whether both plaintiffs' actions carried "public ramifications."  People v. Munafo, 50 N.Y.2d 326, 331 (1980) (describing the aim of the disorderly conduct statute as being "situations that carr[y] beyond the concern of individual disputants to a point w[h]ere they had become a potential or immediate public problem").  In doing so, "courts are constrained to assess the nature and number of those attracted, taking into account the surrounding circumstances, including, of course, the time and the place of the episode [] under scrutiny."  Id.  Remaining in the middle of a large crowd of demonstrators in order to observe the police arresting demonstrators was of a public, rather than private, dimension.  It was a matter "beyond the concern of [both] individual" participants.  Id.

- 12 -

Regarding the intent requirement, "the statute does not require proof of the accomplished fact of public inconvenience, annoyance or alarm; but proof only from which the [r]isk of it, recklessly created, might be inferred." People v. Todaro, 26 N.Y.2d 325, 328 (1970) (internal quotation marks omitted). Both Pesola and Allen allege that they remained on the scene of the protest after the police gave a dispersal order and that they, along with others, approached active arrests to observe, and in Allen's case photograph, the police. (P. Compl. ¶ 36; A. Compl. ¶ 36). The photographs attached to each complaint show that the crowd around the police was large and chaotic prior to and during the time defendants arrested plaintiffs. (P. Compl. Ex. A; A. Compl. Ex. A). Pesola alleges that demonstrators and observers gathered around that sidewalk "expressing anger verbally." (P. Compl. ¶ 32). And, Allen alleges that defendants had to specifically order, and physically pull, plaintiff back before arresting him, because of his proximity to an ongoing arrest. (A. Compl. ¶¶ 36-37, 41).

The undisputed facts alleged in both complaints are sufficient to warrant the reasonable belief that Pesola and Allen were recklessly creating a public inconvenience and exhibiting a reckless disregard for public safety. See Nelson, 2011 WL 1327332, at *4, (holding that "[t]he combination of the icy conditions, the position of defendant's group in the only shoveled path leading up to the door of the Market, and the impediment the defendant's group caused to the goal of the customers to enter the Market in a convenient and safe manner is sufficient to warrant a person of reasonable caution to believe that defendant was recklessly creating a hazardous public inconvenience"); see also Todaro, 26 N.Y.2d at 329 ("On this record, the trial court could well have found beyond a reasonable doubt that the appellant was aware of and consciously disregarded a substantial and unjustifiable risk that 'public inconvenience, annoyance or alarm' might result from his use of clearly 'abusive and obscene language' in

response to the officer's repeated requests to move on and his refusal to comply with such requests.").

The facts alleged in both Pesola's and Allen's Complaint, including the exhibits thereto, establish, as a matter of law, that there was probable cause to arrest both plaintiffs for violating N.Y. Penal Law §240.20(6).  On that basis, Pesola's and Allen's false arrest claims are dismissed.[4]

B.  Excessive Force.

A claim that excessive force was used during an arrest is analyzed under Fourth Amendment principles.  Graham v. Connor, 490 U.S. 386, 394 (1989).  To prevail, a plaintiff must show that a defendant's use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. at 397.  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Id. at 396.  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' [], violates the Fourth Amendment."  Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (internal citation omitted).  Courts in this Circuit regularly hold that a plaintiff must have sustained some injury to maintain a claim of excessive force.  See, e.g., Acosta v. City of New York, 11 cv 856 (KBF), 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012); Wims v. New York City Police Dep't, 10 cv 6128 (PKC), 2011 WL 2946369, at *4-5 (S.D.N.Y. July 20, 2011).

---

[4] Defendants are also entitled to qualified immunity on both claims of false arrest because of the Court's conclusion that there was probable cause to arrest each plaintiff.  See Marcavage, 689 F.3d at 110 n.7 (2d Cir. 2012) ("Because we conclude there was probable cause for Plaintiffs' arrest, a fortiori he would be entitled to qualified immunity on this claim."); cf. Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) ("Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was "arguable probable cause" to arrest.").

That injury, however, need not be severe.  See Lindsey v. Butler, 43 F. Supp. 3d 317, 328

(S.D.N.Y. 2014) (denying dismissal of excessive force claim where Plaintiff alleged he was

"pushed to the ground without provocation with enough pressure to cause a mild concussion,

dizziness, and lower back pain"); Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987) (denying

summary dismissal of excessive force claim where plaintiff "testified that she suffered bruises

lasting a 'couple weeks'").  Under certain circumstances, even allegations that officers

gratuitously inflicted pain may be sufficient to sustain an excessive force claim.  See Amnesty

Am. v. Town of W. Hartford, 361 F.3d 113, 124 (2d Cir. 2004) (reversing district court's grant

of summary judgment dismissing excessive force claim where "a reasonable jury could also find

that the officers gratuitously inflicted pain in a manner that was not a reasonable response to the

circumstances"); Omor v. City of New York, 13 cv 2439 (RA), 2015 WL 857587, at *7

(S.D.N.Y. Feb. 27, 2015) ("Courts in this Circuit have generally found that handcuffing does not

suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or

bruising.")

Pesola and Allen allege that defendants used excessive force during their

respective arrests.  (P. Compl. ¶¶ 37-38; A. Compl. ¶¶ 44-45).  Specifically, Pesola alleges that

Pesola's Does #3-6 twisted his arm behind his back and raised it to his shoulder blades, (P.

Compl. ¶ 38), and that Winski employed an "unlawful choke hold" against him, (P. Compl. ¶

37).  Pesola's Complaint includes no description of the nature or severity of the "choke hold,"

and the photographs included in Exhibit A to his Complaint provide no greater detail.  Allen

alleges that Allen's Does #3-8 "forcibly and violently" pulled him in opposite directions, (A.

Compl. ¶ 44), and that Allen's Does #3-6 drove his "face into the pavement while twisting his

arms behind his back," (Compl. 45).  The photographs in Allen's Exhibit A do not show

defendants throwing Allen's face into the ground.  Critically, neither plaintiff alleges that he suffered any injuries, permanent or temporary, or even any pain, short-term or chronic, as a direct result of the use of force.

A plaintiff's resulting pain or injury is not the only factor courts take into account when evaluating an excessive force claim.  See Robison, 821 F.2d at 924; Graham, 490 U.S. at 396.  For example, courts in this Circuit have denied summary dismissal of excessive force claims where, despite minimal evidence of injury, plaintiffs have claimed that defendants used a substantial amount of force.  See, e.g., Campbell v. City of New York, 06 cv 5743 (HB), 2010 WL 2720589, at *8 (S.D.N.Y. June 30, 2010) (denying summary judgment on excessive force claim where plaintiff claims he was kicked, punched, and tackled at time of arrest and choked, slapped in the face, and burned with a lit cigarette when interrogated at the police station, despite minimal evidence of injury).  Even so, where a complaint alleges that a minimal use of force caused no, or only de minimis, injuries, courts in this Circuit hold that a plaintiff has failed to state a plausible excessive force claim.  See, e.g., Acosta, 2012 WL 1506954, at *10 (dismissing excessive force claim where plaintiff alleged that an officer "pushed his wrist into his pocket, punched him in the chest, threw him to the ground face first, forcibly handcuffed his left arm, and attempted to manipulate his right arm into handcuffs as well"); Wims, 2011 WL 2946369, at *4 (dismissing excessive force claim where plaintiff asserted that "he was pulled out of his car and 'thrown flat on [his] face unto the filthy ground'"); Bender v. City of N.Y., 09 cv 3286 (BSJ), 2011 WL 4344203, at *6 (S.D.N.Y. Sept. 14, 2011) (dismissing excessive force claim where plaintiff claimed only that she was "turn [ed] [] upside down, handcuff[ed] [] multiple times, [and] physically assault[ed]") (alterations in original); Lemmo v. McKoy, 08 cv 4264 (RJD), 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011) (collecting cases).

At the motion to dismiss stage, it is often difficult for a court to assess whether a complaint's allegation of the degree of force utilized by a law enforcement officer meets the pleading threshold for an actionable claim.  For example, it might be easy to say that allegations about the use of a "choke hold" necessarily describe an extreme use of force.  But, the term "choke hold" does not have one universal meaning.  It could describe a maneuver intended to restrict an individual's airway, potentially leading to a loss of consciousness or worse.  That is unquestionably an extreme use of force.  Or, it could describe a maneuver where an individual is restrained from behind with brief and incidental contact with the neck area.  The NYPD's Patrol Guide prohibits the use of "choke holds."[5]  However, the Patrol Guide cannot authorize an unconstitutional use of force and its prohibition of certain techniques does not render those techniques per se unconstitutional.  Nevertheless, given the range of possible force implicated by the alleged use of a "choke hold," the Court finds that, after drawing all reasonable inferences in his favor and taking into account the totality of the circumstances of his arrest, Pesola has alleged a plausible excessive force claim.

Conversely, Allen does not allege a plausible excessive force claim.  Allen alleges that defendants used only minimal force during his arrest.  Defendants pushed him in opposite directions, threw him into the ground face first, and twisted his arm behind his back.  And, Allen does not allege any resulting injuries.  Even after construing all reasonable inferences in Allen's favor, the Court cannot plausibly infer that this minimal amount of force was excessive in the

---

[5] The NYPD Patrol Guide has prohibited the use of "chokeholds" for more than 20 years.  See New York City Civilian Complaint Review Board, "A Mutated Rule: Lack of Enforcement in the Face of Persistent Choke Hold Complaints in New York City," (2014).  But, according to the NYC Civilian Complaint Review Board, only the use of certain kinds of "chokeholds" would lead to discipline for an officer.  Id. ("In their respective charging decisions, the CCRB and the Department Advocate redefined a "chokehold" to require force to the neck during which an officer actually and substantially interfered with a complainant's breathing rather than "pressure" to the neck which "may" interfere with breathing.").

absence of any alleged injury.  Accordingly, defendants' motion to dismiss Pesola's excessive

force claim is denied, but defendants' motion to dismiss Allen's excessive force claim is granted.

   C.  Excessive Detention.

           The Fourth Amendment also "governs the procedures applied during some period

following an arrest."  Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005).  Again, the

Fourth Amendment's reasonableness test is one of "objective reasonableness," meaning that the

subjective motivations of individual officers have no bearing on whether a seizure was

reasonable under the Fourth Amendment.  Id.  "In the context of pretrial detention, the Supreme

Court has held that, when there has been a warrantless arrest, the Fourth Amendment requires a

prompt judicial determination of probable cause as a prerequisite to an extended pretrial

detention."  Id.; see Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975).  The Supreme Court

subsequently clarified what it meant by "prompt" judicial determination of probable cause and

held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours

of arrest will, as a general matter, comply with the promptness requirement."  Cty. of Riverside

v. McLaughlin, 500 U.S. 44, 56 (1991).  In sum, "[w]hat is constitutionally required is that,

except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the

arrest within 48 hours."  Bryant, 404 F.3d at 138; see also McLaughlin, 500 U.S. at 56

("Examples of unreasonable delay are delays for the purpose of gathering additional evidence to

justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's

sake.").  In New York, because probable cause determinations are made at arraignments, the

Fourth Amendment requires that an arrestee be arraigned within 48 hours.  See Bryant, 404 F.3d

at 138.

Pesola alleges that defendants held him for 38 hours prior to arraignment.  (P. Compl. ¶¶ 44, 47).  Allen alleges that defendants held him for 47 hours.  (A. Compl. ¶ 60).  Both lengths of pre-arraignment detention are presumptively reasonable, although Allen's detention is at the outer limit of the Supreme Court's 48 hour per se rule.  See Bryant, 404 F.3d at 138.  Critically, both plaintiffs also allege that, after the 23rd hour of detention, "all necessary steps had been taken to prepare [each] plaintiff for arraignment."  (P. Compl. ¶ 44; A. Compl. ¶ 54).  The police even went so far as to take Allen into the courtroom to be arraigned.  (A. Compl. ¶ 55).  At that juncture, however, before either plaintiff was actually arraigned, Pesola's Doe #7 and Allen's Doe #7 asked each respective plaintiff to submit to an iris scan, warning that if Pesola or Allen refused that individual would not be arraigned.  (P. Compl. ¶ 45; A. Compl. ¶ 56).  Both plaintiffs refused.  (P. Compl. ¶ 46; A. Compl. ¶ 57).  Allen alleges that Allen's Doe #7 then said "[w]e'll try this again tomorrow" and held plaintiff for an additional 24 hours.  (A. Compl. ¶¶ 58-59).  Pesola alleges that his detention continued for an additional 15 hours.  (P. Compl. ¶ 47).  Pesola and Allen never submitted to an iris scan, but each was eventually arraigned.  (P. Compl. ¶ 48; A. Compl. ¶ 61).

A probable cause determination, even if provided within 48 hours, may not pass constitutional muster "if the arrested individual can prove that his or her probable cause determination was delayed unreasonably."  McLaughlin, 500 U.S. at 56.  Examples of unreasonable delay are: (1) "delays for the purpose of gathering additional evidence to justify the arrest," (2) "a delay motivated by ill will against the arrested individual," and, (3) "delay for delay's sake."  Id.  The question is whether a delay in arraignment, if caused by a plaintiff's refusal to submit to an iris scan, plausibly can be considered an "unreasonable delay."  Id.

The 15 and 24 hour delays allegedly caused by Pesola's and Allen's refusal to submit to an iris scan are not categorically unreasonable.  There may be some set of facts brought out in discovery that demonstrates a nexus between the refusal and the delay that makes each delay appear reasonable.  For example, if the iris scan was a speedier and more accurate way to check Pesola's identity and criminal background and his refusal forced the police to use a slower means of investigation, the resulting delay may be reasonable.  Or, the delay may be reasonable if the iris scan made it easier for the police to arraign others waiting alongside Allen, and, as a consequence, Allen moved down in the arraignment queue.  However, justifications for the delay that are not apparent on the face of the complaint are not appropriately considered on a motion to dismiss.

Pesola and Allen both allege that the 15 and 24 hour delays were punishments for refusing to submit to a scan, which, if true, may qualify as a "delay motivated by ill will against" each plaintiff and makes each detention unreasonable.  McLaughlin, 500 U.S. at 56.  At this early stage and on the facts alleged, Pesola's and Allen's excessive detention claims cannot be dismissed.

D.  Due Process

Both Pesola and Allen also argue that the delay in arraignment caused by each plaintiff's refusal to submit to an iris scan violated each plaintiff's right to due process of law under the Fourteenth Amendment.  Specifically, both plaintiffs allege that the delay violated N.Y. Criminal Procedure Law § 140.20, which, according to both, created a liberty interest protected by the Federal Constitution.

§ 140.20(1) states:

Upon arresting a person without a warrant, a police officer, after performing without unnecessary delay all recording, fingerprinting

> and other preliminary police duties required in the particular case,
> must except as otherwise provided in this section, without
> unnecessary delay bring the arrested person or cause him to be
> brought before a local criminal court and file therewith an
> appropriate accusatory instrument charging him with the offense or
> offenses in question.

"New York courts have interpreted this statute to mean that any delay over twenty-four hours is presumptively unnecessary."  Simmons v. Kelly, 06 cv 6183 (RJS), 2009 WL 857410, at *5 (S.D.N.Y. Mar. 31, 2009) (citing People ex rel. Maxian v. Brown, 561 N.Y.S.2d 418, 424 (1st Dep't 1990), aff'd, 77 N.Y.2d 422, 426 (1991)).  However, the Second Circuit has explicitly held that N.Y. CPL § 140.20, like other state rules of criminal procedure, "does not create a liberty interest that is entitled to protection under [] the federal Constitution."  Watson v. City of New York, 92 F.3d 31, 37-38 (2d Cir. 1996); see also Pugliese v. Nelson, 617 F.2d 916, 924 (2d Cir. 1980) (quoting Cofone v. Manson, 594 F.2d 934, 938 (2d Cir. 1979)) ("'Although a Due Process Clause liberty interest may be grounded in state law that places substantive limits on the authority of state officials, no comparable entitlement can derive from a statute that merely establishes procedural protections.'").  Thus, the only federally-protected liberty interest at stake for either plaintiff is the Fourth Amendment's freedom from unreasonable confinement, see Watson, 92. F.3d at 38, which the Court has already determined should move forward to discovery in each case.  Plaintiffs' due process claims are therefore dismissed.

E.  Malicious Prosecution.

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and establish the elements of a malicious prosecution claim under state law."  Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002).  "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against

plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010) (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)).  "[T]he existence of probable cause is a complete defense to a claim of [] malicious prosecution in New York."  Id. at 161-62 (quoting Savino, 331 F.3d at 72). The plaintiff bears the burden of plausibly alleging all of the elements of a malicious prosecution claim, including that there was a "lack of probable cause for commencing the proceeding." Manganiello, 612 F.3d at 161; see Broughton v. State, 37 N.Y.2d 451 (1975) ("Where the plaintiff institutes a malicious prosecution action he must plead the lack of probable cause.").

       Pesola and Allen both fail to plausibly allege a lack of probable cause for their prosecution.  Neither complaint alleges the nature of the charges brought against each respective plaintiff.  Without alleging the charges for which Pesola or Allen was prosecuted, the plaintiffs have failed to plausibly allege that they were prosecuted on the charge without probable cause. Here, the Court has held that there was probable cause to arrest both for a disorderly conduct violation pursuant to N.Y. Penal Law § 240.20(6).  The Court has no way of knowing whether plaintiffs are alleging malicious prosecution for disorderly conduct, which would not be actionable, or for some other charge, which may be actionable.  The only allegation both plaintiffs make regarding probable cause is that "Defendants lacked probable cause to believe that Plaintiff was violating a lawful order to disperse."  (P. Compl. ¶ 40; A. Compl. ¶ 51).  The Court has held that there was such probable cause for both.  As a result, to the extent Pesola and Allen are alleging that each was prosecuted for a violation of § 240.20(6), both have failed to plausibly allege a lack of probable cause.  Otherwise, to the extent each is alleging that he was

prosecuted for a different crime or violation, neither complaint alleges a lack of probable cause regarding any other charges.

Pesola and Allen also fail to plausibly allege that the probable cause supporting a prosecution for § 240.20(6) violation has dissipated.  Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996) ("In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact.").  Because both plaintiffs fail to plausibly allege a lack of probable cause to prosecute, both malicious prosecution claims fail.

F.  Right to a Fair Trial.

Pesola, alone, alleges that defendants Winski and Viviano "filed false reports" that caused him to be prosecuted.  (P. Compl. ¶ 42).  Read generously, Pesola could be alleging a claim for a deprivation of his right to a fair trial.  See Shamir v. City of New York, 804 F.3d 553, 556 (2d Cir. 2015) ("It is entirely understandable that the District Court did not adjudicate an alleged claim of excessive force. Nowhere in the complaint is there an explicit claim that excessive force was used in the course of Shamir's arrest . . . . Nevertheless, we feel obliged, with apologies to the District Court, to infer the pleading of an excessive force claim from the clues lurking beneath the inartful wording of the complaint.").  Mindful of the Circuit's holding in Shamir, the Court will oblige Pesola and will address his inferred fair trial claim.

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial."  Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); see also Morse v. Fusto, 804 F.3d 538, 548 (2d Cir. 2015).  A plaintiff need not have proceeded to a full trial on the merits in order to have an actionable section 1983 claim based on the denial of a fair

trial.  See Ricciuti, 124 F.3d at 127 (criminal charges dismissed pre-trial); Canario v. City of New York, 5 cv 9343 (LBS), 2006 WL 2015651, at *1 (S.D.N.Y. July 12, 2006) (plaintiffs original criminal charges were dismissed pre-trial).

Pesola's assertions that Winski and Viviano "filed false reports" pertaining to his unspecified criminal charges, do not plausibly allege a fair trial claim.  Critically, plaintiff fails to assert how, in what way, or to what effect, the defendants falsified these reports and to whom the reports were forwarded.  A fair trial claim cannot survive a motion to dismiss based only on broad and conclusory allegations that officers "filed false reports."  See Abdul-Rahman v. City of New York, 10 cv 2778 (ILG), 2012 WL 1077762, at *12 (E.D.N.Y. Mar. 30, 2012) (dismissing a plaintiff's fair trial claim "because he has presented only the most conclusory and generalized allegations, failing to specify in what way the statements, information, or testimony were false or even in what material respect the charges against him were false"); cf. Brown v. City of New York, 2014 U.S. Dist. LEXIS 181736, *10 (E.D.N.Y. Dec. 23, 2014) (dismissing right to fair trial claim based on allegedly false statements contained in arrest paperwork); Blair v. City of New York, 03 cv 1485(SLT) (CLP), 2009 WL 959547, at *11 (E.D.N.Y. Mar. 31, 2009) ("Falsified or fabricated evidence alone does not amount to a constitutional violation, however. The constitutional violation occurs when such evidence is admitted at trial and impairs the truth-seeking function of the court proceedings.").  Pesola's conclusory allegations do not survive defendants' motion to dismiss.

G.  First Amendment Retaliation.

Both plaintiffs' allegation that "[a]s a direct and proximate result of [his arrest], Plaintiff was obstructed, prevented, and discouraged from engaging in speech and expression," (Compl. ¶ 80), amounts to stating a claim for First Amendment retaliation.  "To plead a First

Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. Cty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013). A plaintiff must allege that he was engaged in speech protected by the First Amendment to satisfy the first element.

   Pesola and Allen allege that each was engaged in protected activity. (P. Compl. ¶ 17; A. Compl. ¶ 17). Pesola's only non-conclusory allegation, however, is that he was present at Zuccotti Park observing the demonstrators and police. (P. Compl. ¶ 17). And, Allen's only non-conclusory allegation is that he was "observing and photographing" the demonstration. (A. Compl. ¶ 17). Observing others at a demonstration is conduct with little or no expressive content and is afforded no particular protection by the First Amendment. See Pluma v. City of New York, 13 cv 2017 (LAP), 2015 WL 1623828, at *8 (S.D.N.Y. Mar. 31, 2015) (holding that plaintiff who admitted to being "a bystander and citizen journalist witnessing the event," rather than a protester in OWS, was not engaged in expressive conduct). Nor is it clear that observing and photographing a demonstration for non-public purposes is protected expressive conduct. See Higginbotham v. City of New York, 105 F. Supp. 3d 369, 380 (S.D.N.Y. 2015) (holding "that the right to record police activity in public, at least in the case of a journalist who is otherwise unconnected to the events recorded," was clearly established). Nevertheless, it is unnecessary for the Court to reach either question.

   The existence of probable cause will defeat a First Amendment claim "premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive." Fabrikant v. French, 691 F.3d 193, 215 (2d Cir. 2012); see also Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992) ("An individual does not have a right under the First Amendment to be free from

a criminal prosecution supported by probable cause, [even if it is] in reality an unsuccessful attempt to deter or silence criticism of the government."); Norton v. Town of Islip, 97 F. Supp. 3d 241, 257 (E.D.N.Y. 2015) (holding that even if plaintiff "had stated a plausible claim against [defendants], the Court would still dismiss [plaintiff's] First Amendment retaliation claim because the appearance tickets against [plaintiff] were supported by probable cause").  As explained above, defendants had probable cause to arrest both plaintiffs for a disorderly conduct violation pursuant to N.Y. Penal Law § 240.20(6).  Because there was probable cause to arrest Pesola and Allen, their First Amendment retaliation claims are dismissed.

H.  Personal Involvement.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)).  Only Pesola's excessive force and excessive detention claims and Allen's excessive detention claim survive.  If plaintiffs fail to plausibly allege the personal involvement of any of the individual defendants in their respective claims, those claims must be dismissed as to those defendants.

Personal involvement may be established by evidence that "the defendant participated directly in the alleged constitutional violation."  Colon, 58 F.3d at 873.  "[D]irect participation" means "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal."  Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001).  "Indirect" conduct, "such as ordering or helping others to do

the unlawful acts, rather than doing them [oneself]," can also constitute "direct participation." Id. [6]

Regarding Pesola's excessive force claim, he alleges that Winski put him in the "choke hold" and that Pesola's Does #3-6, as well as Winski, twisted his arm behind his back and raised it to his shoulder blades. (Compl. ¶¶ 37-38). Accordingly, Pesola has plausibly alleged those defendants personal involvement in his surviving excessive force claim.

Regarding both plaintiffs' excessive detention claims, Pesola alleges that Pesola's Doe #7 was the only individual responsible for the decision to impose the alleged 15 hour punitive delay and Allen alleges that Allen's Doe #7 was the only individual responsible for his 24 hour delay. (P. Compl. ¶ 45; A. Compl. ¶ 45). Consequently, Pesola's excessive detention claim survives only against Pesola's Doe #7 and Allen's excessive detention claim survives only against Allen's Doe #7.

I.   Failure to Intervene.

Plaintiffs also allege that certain individual defendants, other than those "personally involved," failed to intervene to prevent the deprivation of their constitutional rights. (Compl. ¶ 79). Because a "failure to intervene [] claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim," Matthews v. City of New York, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012); see also Feinberg v. City of New York, 99 cv 12127 (RC), 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004), Pesola's and Allen's failure to

---

[6] There may be other bases for determining whether individual defendants were personally involved in the constitutional deprivations underlying certain section 1983 claims. See Colon, 58 F.3d at 873 (describing five ways personal involvement can be established). But see Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (casting doubt on the Colon test); Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after Iqbal."). However, plaintiff fails to plausibly allege any other basis, beyond direct participation, for any defendants' personal involvement. For that reason, the Court will not address any other theory, beyond a failure to intervene.

intervene claims are assessed only as they relate the surviving excessive detention claims and Pesola's excessive force claim.

       "All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." <u>Anderson</u>, 17 F.3d at 557.  "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, [] (2) that a citizen has been unjustifiably arrested [] or (3) that any constitutional violation has been committed by a law enforcement official []." <u>Id.</u>  However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring."  <u>Id.</u>

       Pesola and Allen only allege the involvement of Pesola's Doe #7 and Allen's Doe #7 respectively in their excessive detention claims.  (Compl. ¶ 45).  Neither complaint alleges that any of the other individual defendants were present when Pesola or Allen refused the iris scan or at any other point during the two plaintiffs arraignments.  Because both plaintiffs fail to show that any of the other individual defendants had a realistic opportunity to intervene in their detentions, no claim is plausibly alleged against any defendant for failing to intervene in either plaintiffs' alleged excessive detention.

       Regarding Pesola's excessive force claim, he alleges that, in addition to Winski and Pesola's Does #3-6, Lieutenant Viviano was present and involved in his seizure and arrest, which is when the use of force occurred.  (Compl. ¶¶ 37, 39).  Pesola thus plausibly alleges that Viviano had "a realistic opportunity to intervene to prevent" the use of excessive force. <u>Anderson</u>, 17 F.3d at 557.  However, Pesola fails to plausibly allege a failure to intervene claim against Pesola's Does #1, 2, and 7.  While he alleges that Pesola's Does #1, 2 and 7 were present

in Zuccotti Park dealing with demonstrators, (Compl. ¶¶ 33-34), Pesola does not allege that they were near or witnessed the use of force against him.

    J.  <u>Monell</u> Claims.

        Finally, Pesola and Allen assert that the City of New York is liable for the deprivation of their respective constitutional rights.  A municipality may not be held liable on section 1983 claims solely "by application of the doctrine of *respondeat superior*."  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 478 (1986).  Instead, in order to establish municipal liability, a plaintiff must show that: (1) "a particular municipal action *itself* violates federal law, or directs an employee to do so," <u>Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown</u>, 520 U.S. 397, 404 (1997) (emphasis in original), (2) an "authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right," <u>Id.</u> at 405, (3) unconstitutional "practices [are] so persistent and widespread as to practically have the force of law," <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011), or (4) a municipality's failure to train its employees about their legal duty to avoid violating a citizen's rights amounts to "deliberate indifference," <u>id.</u>  In any case, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  <u>Bryan Cty.</u>, 520 U.S. at 404.

        Both plaintiffs allege that the City of New York maintains three policies that caused them to be deprived of their constitutionally protected rights, including: (1) mandating "false arrests of persons engaged in" and suppressing "First Amendment activity in the public spaces of New York City," (P. Compl. ¶¶ 1-2, 68-69; A. Compl. ¶¶ 1-2, 78-79); (2) permitting officers to "conceal their own identities and the identities of fellow officers directly participating in arrests and uses of force," (P. Compl. ¶ 70; A. Compl. ¶ 80); and, (3) failing "to bring

disciplinary charges against those officers who sanction or ignore [or cover up] unlawful stops, searches, arrests, imprisonments, use of excessive force, and interference with citizens' rights under the U.S. Constitution 1st and 4th Amendments," (P. Compl. ¶ 71; A. Compl. ¶ 81).  Both plaintiffs also allege that the City failed to properly train the respective individual defendants. (P. Compl. ¶ 101; A. Compl. ¶ 101).  The Court will address the three <u>Monell</u> claims based on municipal policies first and then will address the <u>Monell</u> claim based on the City's failure to train its police.

    1.  Municipal Policies.

       When alleging a <u>Monell</u> claim based on the existence of a municipal policy or practice, plaintiffs must show that the practice causing the deprivation of federal rights is "so persistent and widespread as to practically have the force of law."  <u>Connick</u>, 563 U.S. at 61. Generally, "a single incident alleged in a complaint, especially if it involved only actors below the policy making level, does not suffice to show a municipal policy." <u>DeCarlo v. Fry</u>, 141 F.3d 56, 61 (2d Cir. 1998).  "[T]he mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." <u>Zahra v. Town of Southold</u>, 48 F.3d 674, 685 (2d Cir.1995) (alterations omitted) (quoting <u>Dwares v. City of N.Y.</u>, 985 F.2d 94, 100 (2d Cir.1993)).

       With respect to the alleged policy of mandating "false arrests of persons engaged in," and suppressing, "First Amendment activity in the public spaces of New York City," by issuing orders that create congestion followed by issuing "unlawful" dispersal orders.  (P. Compl. ¶¶ 1-2, 68-69; A. Compl. ¶¶ 1-2, 78-79), there is no direct causal link between it and either of the surviving claims for excessive detention or Pesola's excessive force claim.  Both Pesola's and Allen's false arrest and First Amendment retaliation claims have been dismissed.

Regarding the second and third alleged policies, permitting officers to "conceal their own identities and the identities of fellow officers directly participating in arrests and uses of force," (P. Compl. ¶ 70; A. Compl. ¶ 80), and failing "to bring disciplinary charges against those officers who sanction or ignore . . . interference with citizens' rights under the U.S. Constitution 1st and 4th Amendments," (P. Compl. ¶ 71; A. Compl. ¶ 81), there is at most an indirect relationship between those policies, which describe how the City allegedly deals with officers who have already committed constitutional violations, and Pesola's and Allen's detention or the use of force against Pesola.  But, even assuming there was a direct causal relationship, neither plaintiff shows that a continuing pattern or practice of the wrongs alleged in either policy exists such that the Court could plausibly infer that the policies were "so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61.  Pesola and Allen merely allege, as conclusions, the existence of policies whereby the City fails to take action against officers who excessively detain or use excessive force against an arrestee.  The allegations, in all events, are entirely conclusory and fail to state plausible Monell claims.

2.  Failure to Train.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61.  Plaintiffs must show that a municipality's failure to train its employees amounted to "deliberate indifference." Id. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. (quoting Bryan Cty., 520 U.S., at 410).  Generally, "[a] pattern of similar constitutional violations by untrained employees is [] necessary to demonstrate deliberate indifference for purposes of failure to train." Id. at 62 (internal quotation marks omitted).  A plaintiff must also "demonstrate that the policymaker's

inaction was the result of conscious choice and not mere negligence." Cash v. Cty. of Erie, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks omitted). "[D]eliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, [], but the policymaker fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs." Id. (internal citations and quotation marks omitted). See also Walker v. City of New York, 974 F.2d 293, 297 (2d Cir. 1992) (setting forth a three prong test for determining whether "a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens").

Plaintiffs' only allegations regarding the City of New York's failure to train its police officers is the assertion that the City, through the NYPD, "maintained de facto policies, practices, customs, and usages of failing to properly train, screen, supervise, or discipline employees, and of failing to inform the individual defendant's supervisors of their need to train, screen, supervise, or discipline defendants." (P. Compl. ¶ 101; A. Compl. ¶ 101). Neither Pesola nor Allen specify which of the many constitutional deprivations they claims they suffered resulted from the City's failure to train its employees, nor does either allege facts showing a pattern or practice of any constitutional violations. Both plaintiffs merely plead the broad and unsubstantiated conclusion that the City failed to train its employees and therefore is liable for plaintiffs' constitutional injuries. These allegations are inadequate to state plausible Monell claims.[7]

---

[7] In both Pesola's and Allen's memoranda of law in opposition, each plaintiff appears to allege a Monell claim based on the City's policy of conducting iris searches of all arrestees, which are "warrantless, not based on probable cause, not ordered by a court, not authorized by law." (Pesola's Memorandum in Opposition, 8; Allen's Memorandum in Opposition, 7). These claims sound in the Fourth Amendment's prohibition on unreasonable searches. However, no such claim was brought against any of the defendants, nor did plaintiffs actually submit to an iris scan. The only allegations in either complaint relating to the iris scan are that the individual defendants Pesola's and Allen's Does # 7 prolonged plaintiffs' detentions because plaintiffs refused their respective scans. Plaintiffs do not allege that the City has a policy of punitively delaying pre-arraignment detentions based on its iris scan policy.

In sum, both plaintiffs fail to plausibly allege any basis for holding the City of New York liable for their constitutional deprivations.

CONCLUSION

Both motions to dismiss are granted in part and denied in part.  Regarding Pesola's lawsuit, all claims are dismissed except for (1) the excessive force claim against defendants Winski and Pesola's Does #3-6 and the related failure to intervene claim against defendant Viviano, and (2) the excessive detention claim against Pesola's Doe #7.  Regarding Allen's lawsuit, all claims are dismissed except for the excessive detention claim against Allen's Doe #7.  All other claims are dismissed against all other defendants, including the City of New York.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 30, 2016

- 33 -